## WASHINGTON TIMES CO. v. MURRAY.

(Court of Appeals of District of Columbia. Submitted April 22, 1924. Decided June 2, 1924.)

No. 4064.

1. **Libel and slander ⊂⊃123(2)—Publication of article imputing that plaintiff was secret agent of Soviet government required submission to jury.**

Publication of newspaper article, stating that plaintiff, a trance medium, was linked with Soviet government and mentioned as its secret agent, and that papers were on file in State Department indicating activities in this country on behalf of that government, *held* to require submission of case to jury.

2. **Damages ⊂⊃220—Verdict for only one amount regarded as compensatory damages, in view of instructions.**

Where jury were instructed as to both compensatory and punitive damages, and told, if they awarded both, they should state amount of each, and verdict was for only one amount, it will be regarded as for compensatory damages only.

3. **Libel and slander ⊂⊃123(2)—Case submitted to jury, if article susceptible of libelous meaning.**

When a published article is incapable of being understood in a libelous sense, a verdict should be directed; but, if it is susceptible of more than one meaning, one of which may be libelous, question must be submitted to jury.

4. **Libel and slander ⊂⊃101(2)—Plaintiff must prove that article bore meaning ascribed to it.**

Before plaintiff can recover, she must prove by a preponderance of the evidence that alleged libelous article bore the meaning ascribed to it in the innuendo.

5. **Trial ⊂⊃260(3)—Request held covered by instruction as to burden of proof.**

A request that, before plaintiff could recover, she must prove by a preponderance of the evidence that alleged libelous article bore meaning ascribed to it in the innuendo, *held* covered by an instruction as to burden of proof.

6. **Trial ⊂⊃267(1)—Court not required to employ precise language of sound request.**

A court need not employ the precise language of a sound request.

7. **Libel and slander ⊂⊃124(1)—Refusal of request limiting consideration to that part of article set forth in declaration held not error.**

Refusal of a request that jury should consider only that part of article set forth in declaration *held* not error, where entire article had been received in evidence without objection.

8. **Libel and slander ⊂⊃111—Exclusion of evidence offered to show social standing, of plaintiff for purpose of diminishing damages, held not error.**

In an action for libel by trance medium, exclusion of plaintiff's writings and doctor's testimony as to plaintiff's condition when he examined her for a temporary commitment to a hospital, offered to show plaintiff's social standing and rank in life, for purpose of diminishing damages, *held* not error, in view of plaintiff's admissions.

9. **Trial ⊂⊃89—Motion to strike out answer, not responsive to question, held proper remedy.**

Where an answer was not responsive to question, the proper course for a party, who deems it prejudicial, is to ask the court to strike it out and direct jury to disregard it.

Appeal from the Supreme Court of the District of Columbia.

Action by Gladys F. Murray against the Washington Times Company. Judgment for plaintiff, and defendant appeals. Affirmed.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Wilton J. Lambert, of Washington, D. C., for appellant.

John S. Hornback and Walter Mandry, both of Washington, D. C., for appellee.

Before ROBB and VAN ORSDEL, Associate Justices, and BARBER, Judge of the United States Court of Customs Appeals.

BARBER, Acting Associate Justice. This is an action of libel against the defendant, tried in the Supreme Court of the District of Columbia, resulting in a verdict in favor of the plaintiff.

[1] The article complained of as set forth in the declaration was as follows:

"Link Spirit Woman to Soviet.

"Mrs. Gladys Murray" (meaning the plaintiff), Trance Medium, Mentioned as Secret Agent.

" * * * Investigators of her strange case turned to the State Department, where, it is said, papers are on file indicating activities in this country in behalf of the Soviet government of Russia."

"Dr. Riddick also was the first informant as to Mrs. Murray's alleged Soviet connections, said to be of such a nature that the State Department could not ignore them."

The innuendo was that the defendant meant and intended thereby—

"to hold the plaintiff up to public hatred, contempt, ridicule, and disgrace, and to cause the public to believe that she was an anarchist and spy, conniving against the government of the United States, and of improper and dangerous action."

The alleged false and defamatory libel was a part of a much longer article, conceded by the defendant to have been published in its paper the Washington Times, circulating in the city of Washington and elsewhere. The entire article, which was published on or about August 19, 1922, was received in evidence on behalf of the plaintiff without objection by defendant.

It appears from the evidence that on the 17th day of August, 1922, plaintiff was admitted to the Emergency Hospital in Washington as a patient, remaining there about two days, when she was transferred to the Washington Asylum Hospital. She remained there a very short time, and was then sent to St. Elizabeth's Hospital under a certificate for temporary commitment made by Dr. Kinney. She stayed there until September 7th following, when she was turned over to the board of charities and sent to New York. While she was in these various institutions here, she was under observation as to her mental condition.

Testimony was given by her to the effect that she returned to Washington the same week she was sent to New York; that by profession she was an actress and lecturer, her last theatrical engagement being nearly three years ago; that she came to Washington in April, 1922; that she had previously been in Bellevue Hospital, New York, a day and a half from which she was railroaded to Central Islip Hospital, an institution for the insane, in which she stayed three months; that since April, 1922, she had been employed in a business office here, and that she came here in the first place to do lecture work and teach; that while on the street in Washington a power from the air descend-

ed on her; that motion and speech were taken from her, and that thereupon she was taken to the Emergency Hospital August 17, 1922, from which she was removed as already appears. She also testified that she had never had a hearing before any insanity court or jury, and there is nothing in the record that contradicts this statement.

She was exhaustively cross-examined, during which she gave testimony tending to show that she believed that she had had Spiritualistic manifestations three years before, at which time automatic writing came to her, which had since been continued, of which there had been many recurrences in Washington, and with reference to which she had interviewed prominent persons here; that she had conferred with employees of the defendant on the subject, and had solicited publication in the Washington Times of some of her automatic writings which she had given them; that when automatic writings were produced by her she was taken possession of by a spirit power, who directed her hand to write; that she did not know what was written until she afterwards saw it on the paper, her hand being used by the power of the spirits who visited her; that she could not command them to come, but they obtained control of her; that, although a medium, she was not a professional one; that through her spirits, purporting to be those of notable historical characters long since dead, whose names she gave, had given expression to views or messages to be communicated to the world on various subjects, which were reduced to writing by her under their control, and she identified certain of such writings, which were offered in evidence by defendant, but excluded by the court.

A witness on the part of the defendant, who was one of its newspaper reporters, testified as to the circumstances under which the alleged libelous article was written by him. On cross-examination he was asked: "Do you know whether any retraction has been made in the columns of the Times?" Objection was made, overruled, and exception allowed to the question. He replied: "Not to my knowledge, sir." No effort was made by counsel for defendant to have the answer stricken out as not responsive, nor was objection made thereto.

[2] The jury were instructed on the subject of both compensatory and punitive damages, and told that, in the event they awarded both, they should in their verdict state the amount of each. The verdict was for only one amount, and must therefore be regarded as for compensatory and not punitive damages. At the close of the testimony the court denied a request of defendant to direct a verdict in its favor, based on the ground that the article in question was not susceptible of an interpretation that was libelous.

[3] It is settled law that, when a published article is incapable of being understood in a libelous sense, a verdict should be directed, but if it is susceptible of more than one meaning, one of which may be libelous, the question must be submitted to the jury. Morning Journal Association v. Duke, 128 Fed. 657, 63 C. C. A. 459; Morrison v. Smith, 177 N. Y. 366, 69 N. E. 725; Odgers on Libel and Slander (4th Ed.) p. 104.

We cannot hold that the statement that the plaintiff, a trance medium, was linked to the Soviet and mentioned as its secret agent, and

that papers were on file in the State Department indicating activities in this country in behalf of the Soviet government of Russia, said to be of such a nature that the State Department could not ignore them, which is a fair interpretation of the part of the article complained of, was not capable of being understood in a libelous sense. The nature of the Soviet government of Russia, its proclaimed purposes and declared activities, beliefs, and teachings, as commonly understood in this country, are such that the article is clearly capable of being understood in a defamatory sense by the readers thereof, and it was the duty of the court to submit its meaning to the jury.

[4-6] The defendant alleges error because the court did not instruct the jury as stated in its prayer No. 2, which in substance was that before the plaintiff could recover she must prove by a preponderance of evidence that the said alleged libelous article bore the meaning ascribed to it in the innuendo. That request was sound law as applicable to this case. We think it was complied with. It will be borne in mind that a court is not required to employ the precise language of a sound request in order to avoid error.

The record shows that the jury were correctly instructed as to the burden of proof. The defendant asked for the following instruction (prayer No. 3), which was given in terms:

"The jury are instructed that, before the plaintiff may recover in this case, they must first find that the article complained of was libelous, and in that connection the rule is that, where an article alleged to be libelous is susceptible to two meanings, it is for the jury to say, after an inspection of the article and a consideration of all the evidence, what would naturally be understood therefrom by the ordinary reader. And if the jury find in this case that the words complained of do not hold the plaintiff up to public hatred, contempt, ridicule, or disgrace, or did not tend to cause the public to believe of the plaintiff that she was an anarchist and spy, conniving against the government of the United States and of improper and dangerous action, then their verdict must be for the defendant."

We think this contained the law of the second request. Thereby the jury were told in substance, first, that they must find the article was libelous, and also that, if they did not find that it held the plaintiff up to public hatred, contempt, ridicule, or disgrace, or that it did not tend to cause the public to believe of the plaintiff that she was an anarchist and spy, conniving against the government of the United States, and of improper and dangerous action, which was the meaning ascribed to the article in the innuendo, their verdict must be for the defendant.

[7] The next assignment of error is to the refusal of the court to instruct the jury as set forth in defendant's prayer No. 4, which was in substance that in deliberating upon the case they should consider only that part of the article published by defendant wherein the words set forth in the declaration appear, for the reason that the plaintiff did not claim that the balance of said article was libelous or had injured her. As already appears, the entire article had been received without objection on the part of the defendant.

If the defendant desired to exclude from the consideration of the jury that part of the article which did not contain the alleged libel,

objection should have been made thereto before it was received in evidence. Plaintiff made no claim that the balance of the article was libelous, and we are not advised on argument, how, if considered by the jury, it could have been prejudicial. The article itself was not allowed to be taken to the jury room. We find no error in the denial of this request.

Error is argued, based upon the assumed fact that the court refused to permit the defendant to question the plaintiff with reference to her employment between April, 1922, and the filing of the suit. The record shows no such refusal. It does, however, appear that objection and exception were taken to allowing the plaintiff to testify on her direct examination as to her employment in Washington. It is not claimed that this was error.

[8] Error is also alleged because the court excluded certain writings identified by plaintiff as made by her when under the control of various spirits, and also the offered testimony of Dr. Kinney as to his opinion of the plaintiff's condition when he signed the certificate for her temporary commitment to St. Elizabeth's, which was after the publication of the article in question. There was no profert as to what his answer would be, and no reason for its admission given. It is not claimed that the plaintiff was insane or was of bad character or repute.

It is argued that these writings and the doctor's testimony were admissible to show plaintiff's social standing and rank in life, for the purpose of diminishing compensatory damages. Whatever Dr. Kinney's opinion may have been as to her condition, mental or physical, at the time he signed the certificate, was not relevant to the question of her rank in life or social standing. Neither were the excluded writings, which are reproduced in the record. They simply confirm what plaintiff, not only admitted, but claimed, with reference to her peculiar powers.

The defendant had full benefit of the fact of plaintiff's peculiar beliefs, her actions, and her commitments to various institutions here and elsewhere, as bearing upon her standing and rank in life. Under the issues as made by the record there was no error in the exclusion of this evidence.

[9] Finally it is alleged that, in receiving the testimony of the reporter of the defendant in the manner hereinbefore set out, the court erred; the claim being that the fact that a retraction had not been made might have resulted in an aggravation of damages. As already appears, however, the question propounded by plaintiff's counsel did not call for any statement by the witness as to whether or not a retraction had been published, but was whether he knew if one had been made, to which the answer was not responsive, and for which plaintiff's counsel was not responsible. The proper course for defendant to have taken, if the answer was deemed to have been inadmissible and prejudicial, was to have asked the court at the time to strike out the answer and to direct the jury to disregard it.

On the whole, we find no error in the proceedings below, and the judgment is therefore affirmed, with costs.