## MONTGOMERY WARD & CO., Inc., v. Mc-GRAW-HILL PUB. CO., Inc.

### No. 8560.

Circuit Court of Appeals, Seventh Circuit.

Dec. 22, 1944.

172

Stuart S. Ball, Harold A. Smith, and Silas H. Strawn, all of Chicago, Ill. (Winston, Strawn & Shaw, of Chicago, Ill., of counsel), for appellant.

H. Templeton Brown, of Chicago, Ill., J. A. Gerardi, of New York City and Carl Meyer and Raymond J. Friend, both of Chicago, Ill. (Mayer, Meyer, Austrian & Platt, of Chicago, Ill., of counsel), for appellee.

Before EVANS, SPARKS, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

Montgomery Ward & Company, hereafter referred to as the plaintiff, filed suit for libel against McGraw-Hill Publishing Company, hereafter referred to as the defendant, the publisher of Business Week. The plaintiff alleged special damages, but none was proved. At the conclusion of the plaintiff's evidence, the trial court sustained a motion by the defendant for a directed verdict, and entered judgment that the plaintiff take nothing by its action. From this judgment the plaintiff has appealed.

The only question presented on this record is whether the trial court erred in granting the motion for a directed verdict. The suit arose out of the publication of an article, appearing in the May 23, 1942 issue of Business Week. The entire article was admitted in evidence without objection. The particular words alleged to be libelous were as follows:

a. "John Steelman, head of the U. S. Conciliation Service * * * was talking about the Montgomery Ward & Co.'s labor policy, which happens to be anathema to both Steelman and the C.I.O. but which the company believes in so strongly that it refuses even to discuss modifications."

b. "Avery's Attitude—The long-standing Ward policy, generally conceded to have been formulated by Sewell Avery, company president, has been based on a refusal to make any concessions to unions."

c. "Early this year Levy had signed up enough Ward employees to be able to go to the company and announce that U.R.W.E. spoke for a majority."

d. "He told company officials that he expected them to recognize the union and bargain with it. He got himself brushed off with a 'nothing doing' said very politely."

e. "The board, aware that a dispute existed over representation, asked Ward to submit to a check of union cards against payroll records in order to determine the union's strength. Again, the company's answer was a polite but firm 'No'."

f. "Board Orders Election—An NLRB representative then asked the company to agree to an election among its employees which would decide whether U.R.W.E. had a majority. Again the answer was 'No'."

g. "Levy and a committee of Ward workers went back to see the management, armed this time with official status. They presented a list of demands—for a wage increase, a union shop, seniority rights, and a contract which would include a provision for arbitration. The company representatives continued to say 'No'."

h. "Union representatives of the bargaining committee reported the conviction that the company negotiators had no power to make decisions."

i. " * * * the fact that Sewell Avery could not be induced to take part in the negotiations * * *"

j. "Conciliation Service found that it was indeed true that Avery had not appeared at any of the conferences and that union requests that he meet with the committee had been turned down."

k. " * * * there was some question as to whether the company representatives were empowered to reach an agreement * * *"

l. "Given the runaround in Chicago, Msgr. Francis J. Haas, Special Commissioner of Conciliation, had no chance to conciliate."

m. "Msgr. Haas's report to Steelman (failure to begin conciliating * * *)."

The defendant admits publishing the article but claims that the words are not libelous per se. If these words were libelous per se, it was error to grant the motion. To determine the propriety of granting such a motion, a court must consider whether reasonable men, reading the words complained of, would ascribe to them a libelous meaning. "It is settled law that, when a published article is incapable of being understood in a libelous sense, a verdict should be directed, * * *." Washington Times v. Murray, 55 App.D.C. 32, 299 F. 903, 905.

The plaintiff alleged that these words meant, were intended to mean, and necessarily were understood by the readers of the publication to mean, that the plaintiff had refused to bargain collectively with the duly chosen representative of its employees, that the plaintiff had failed to give its representatives who met with such employees and their representatives authority to reach an agreement, and that the plaintiff refused to discuss modifications of its labor policy, thus charging the plaintiff with unfair labor practices and with violating the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

The plaintiff further alleged that these words meant, were intended to mean, and necessarily were understood to mean, that the labor policy of the plaintiff was such that it would not under any circumstances make any concessions to labor. unions, that the plaintiff rejected without consideration every request and demand of its employees or their representatives, and that the plaintiff was at all times unfair, unreasonable, harsh, and arbitrary in its relations with its employees and the various agencies of the government.

These allegations, of course, did not make the words libelous per se if they were not such standing alone. Kimball v. Ryan, 283 Ill.App. 456, 466. It is the contention of the plaintiff that these words, having the meaning pleaded in the innuendo, tended to offend organized labor and its friends, who constituted a substantial part of the plaintiff's customers, causing them to discontinue business relations with the plaintiff, thus injuring the plaintiff in its business. If these words are fairly susceptible of carrying this meaning and of having this injurious effect on the plaintiff's business, they were libelous. Willfred Coal Co. v. Sapp, 193 Ill.App. 400, 409.

The first words complained of in the published article are set out in subparagraphs a. and b. of paragraph 8. of the complaint. It is stated that the plaintiff has a labor policy formulated by its president, Sewell Avery, which it believes in so strongly that it refuses even to discuss modifications and that this policy is based on a refusal to make any concessions to unions. Employers can not be condemned for having such a policy. Unions are not entitled in all cases to concessions as a matter of right. Giving these words their ordinary meaning and construction, we cannot gather from them anything libelous.

In subparagraphs c. and d. it is stated in effect that Mr. Levy, a union organizer, made representations to the plaintiff that his union spoke for a majority of its employees and demanded that the plaintiff recognize the union and bargain with it. To this demand the plaintiff "politely" said, "Nothing doing." Levy had a perfect right to make these representations and demands on the plaintiff, and the plaintiff had a perfect right to refuse them. To publish that one refused to do what he is in no way bound to do is ordinarily not libelous. Holloway v. Scripps Publishing Co., 11 Ohio App. 226, 232-233.

In the next two subparagraphs, it is stated that the National Labor Relations Board, aware of a dispute over representation, asked the plaintiff to submit to a check of union cards against its payroll records in order to determine the union's strength, and that upon the plaintiff's "polite" refusal, the Board asked the plaintiff to agree to an election among its employees in order to determine whether the union had a majority, but that again the plaintiff said, "No." We know of no law, rule, regulation, or custom that required the plaintiff to agree to the requests made by the Board. Again we say that to publish that one refused to do what he is not bound to do is ordinarily not libelous.

In subparagraph g. it is stated that Levy returned, "armed this time with official status," and made certain demands upon the plaintiff which were refused. What official status Levy had, and who armed him with it, does not appear. But the company was not bound to accept his demands, whatever status he had acquired. Even if Levy were the duly elected bargaining representative of the employees, the plaintiff had a right to refuse his demands. It was only bound to bargain collectively in good faith with the union representative. There is no statement that the plaintiff refused to do that. Since the plaintiff was within its rights in refusing Levy's demands, the publication of that refusal was not libelous.

In subparagraphs h. and i. it was stated that the union representatives of the bargaining committee reported the conviction that the company negotiators had no power to make decisions, and that Sewell Avery could not be induced to take part in the investigation. We call attention to the fact that part of this statement was only the opinion of the union's representatives. There is no statement that the plaintiff had refused to give its negotiators power to make decisions. It was merely the union committee's conviction that they had no such authority.

It was also stated in subparagraphs j. and k. that the Conciliation Service had found that it was indeed true that Avery had not appeared at any of the conferences and had turned down the union's request that he meet with the committee,

and that there was some question as to whether the company representatives were empowered to reach an agreement. In whose mind these questions occurred does not appear. Neither is it stated that the plaintiff provoked the questions. At what particular time the plaintiff's representatives were supposed to have needed the power to reach an agreement does not appear. The negotiators on behalf of the plaintiff were not required to have the authority to reach an agreement at every stage of the proceedings, but merely at some stage. Besides, the publication of the union committee's opinion that the plaintiff had not given its negotiators sufficient authority does not libel the plaintiff. The plaintiff may, for all the union committee really knew, have given its representatives authority which they were not exercising. As for Mr. Avery, we know of no reason why he, as the plaintiff's president, had to participate in the company's negotiations. To publish that the Conciliation Service found that Mr. Avery was doing what he had a right to do could not be a libel on the plaintiff.

▆ We have pointed out that the published words did not amount to a charge that the plaintiff had violated the National Labor Relations Act. Neither can these words, in our opinion, be tortured into charges that the plaintiff was unfair to labor, so that labor and its friends, numerous among the plaintiff's customers, would be offended and would cease to trade with the plaintiff. Today labor and its friends know that they no longer need to rely on strikes and boycotts to gain their points as they did in the years gone by. They know that their grievances and claims are now considered and protected by governmental agencies, created by the National Labor Relations Act, which labor itself has so often characterized as its Magna Charta. Labor and its friends now know that they do not need to seek redress of their grievances by the impossible task of attempting to boycott a great merchandising corporation having stores all over the United States and mail order catalogues in millions of homes. They wisely make their purchases on other bases and let the appropriate governmental machinery take care of stubborn and recalcitrant employers.

Laboring people and their friends know that the plaintiff, if it persists in its policy of making no concessions to labor, will sooner or later come before the National Labor Relations Board, which in the proper proceedings will designate some union as the bargaining agent of its employees. The union will then become more than a union; it will be the bargaining agent, and the plaintiff will be required to bargain with it in good faith. Whether concessions shall be made then by the plaintiff will not depend on its alleged labor policy to make no concessions to unions, but will depend upon its good faith in bargaining.

We do not believe that reasonable people of the so-called labor group were disposed to consider the acts of the plaintiff, as alleged in the article, as such unfair conduct toward labor as would incite a substantial majority of them and their sympathizers to cease trading with the plaintiff. These words were not reasonably calculated to prejudice the plaintiff in the conduct of its business.

Thus, we are of the opinion that the alleged libelous words cannot reasonably be said to charge the plaintiff either with violation of the National Labor Relations Act or with being unfair to labor.

▆ The plaintiff further contends that the published statements set out in subparagraphs l. and m. of the complaint to the effect that Msgr. Haas, Special Conciliator of the Department of Labor, had been given the "runaround" and had had no chance to conciliate, were reasonably calculated to offend the Catholic people, large numbers of whom were customers of the plaintiff, so that they would cease to do business with it. This, it seems to us, is more far fetched than the plaintiff's contentions with reference to labor. Clearly these words were totally incapable of producing any such effect. Msgr. Haas was not acting as a clergyman or as a representative of his church. He was in the employ of the United States Department of Labor as a conciliator. He was and is a recognized scholar and authority in the field of labor relations and is generally known to be a highly successful conciliator. While he is acting as a layman, we are sure that neither he nor his fellow churchmen expect any special consideration to be shown him. We can not believe that the Catholic people are narrow and bigoted, so that they would be offended if a member of their clergy, while acting, not as a clergyman, but as a layman representing the United States government in an attempt to conciliate a labor dispute,

should be given the "runaround," that is, ignored or evaded. These words were not libelous.

■ We have shown clearly that the words complained of by the plaintiff can not reasonably be construed as charging violations of the National Labor Relations Act. Neither can they be taken as charging the plaintiff with being unfair to labor. But even if they should be assumed to mean the latter, we do not think that a charge of being unfair to labor is libelous. To charge one with being unfair to labor is a much broader charge than to charge one with unfair labor practices. If it were libelous simply to say of another that he is unfair to labor, every picketer who carries a banner with such a legend would be guilty of libel. To say that one is unfair to labor is not a statement of a fact, but of an opinion. Likewise to say of one: you are reactionary, you are undemocratic, you are a nationalist, you are an isolationist, you are a New Dealer, you are a Union Leaguer, you are opposed to labor, you are a coddler of labor, is similarly to express an opinion. Calling one unfair to labor is no different. All of these expressions spring from controversies on questions of public interest. "But written abuse relating solely to political views or arguments on questions of public interest, and which do not attack the character of a person, nor impute immorality, nor violation of law, are not actionable per se." Newell on Libel and Slander, 4th Ed. p. 57.

To say that someone is opposed to the appointment of a certain person as a Federal judge because the prospective appointee is Jewish and foreign-born, has been held in several cases not to be libelous. Sweeney v. Patterson, 76 U.S.App.D.C. 23, 128 F.2d 457. In Sweeney v. Capital News Publishing Co., D.C., 37 F.Supp. 355, 357, the court said:

"We fail to find any words thus expressed tending to impeach the honesty, integrity, virtue or reputation of the plaintiff, or that they expose him to public hatred, contempt or ridicule, for to only say that the plaintiff, a congressional spokesman of Father Coughlin, opposes the appointment of Freed, a foreign-born Jew, includes all Jews as a race regardless of their place of birth, would require the insertion of the words—all Jews. * * * The opposing of a foreign-born Jew or a foreign-born person of any nationality, which a Congressman, or any other person

has the right to do, does not have a tendency, or impair plaintiff's reputation. We are too prone these days in imagining that the use of certain words in expressing a privilege one has will have a tendency of producing a certain result.

\* \* \* \* \*

"Under our fundamental principle of government of the right of free speech there exists a keen diversity of opinion, often expressed, of belief of religious faiths and nationalities in the holding of public office which would not warrant the holding up of a person who has such belief to scorn or contempt among right-thinking people to make a publication expressing such belief libelous per se, and such publication could not fairly be said to have such tendency if we adhere to the belief of fair expression of thought."

If these words were not calculated to injure the plaintiff, as a Congressman, among Jews and foreigners, certainly the words used by the defendant here were not likely to offend the labor group members and Catholics among the plaintiff's customers.

The plaintiff relies upon Swing v. American Federation of Labor, 372 Ill. 91, 95–96, 22 N.E.2d 857, 859 and quotes this statement:

"We have here for consideration an accomplished and continuing libel which is quite a different thing, and we fail to see that it is in any way different from any other form of continuing trespass."

This was not an action for libel. It was a suit to enjoin peaceful picketers from carrying signs stating that the plaintiff was unfair to labor. The injunction was granted, 298 Ill.App. 63, 18 N.E.2d 258, and the Supreme Court of Illinois affirmed the decision, but the Supreme Court of the United States reversed, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855, holding that the decree was inconsistent with the guarantee of freedom of speech. Assuming that the Supreme Court of Illinois considered the words libelous per se, the Supreme Court of the United States evidently did not, or it would not have set the injunction aside as a violation of free speech. If the words were libelous per se, the free speech provisions of the United States Constitution would not have protected their use, for libel is not protected by the free speech provisions of the Constitution. We reject this case as authority for the plaintiff's position.

The plaintiff has also relied heavily upon Willfred Coal Co. v. Sapp, supra, as authority for its contention that a charge of unfairness to labor is libelous per se. In this case, however, the whole import of the published words was to charge the plaintiff company with the violation of state safety laws. Such charges have always been considered libelous per se. Hudson v. Slack Furniture Co., 318 Ill. App. 15, 20, 47 N.E.2d 502; Interstate Optical Co. v. Illinois State Society of Optometrists, 244 Ill.App. 158. None of the cases from other jurisdictions support the plaintiff's contention. In Consolidated Terminal Corporation v. Drivers, Chauffeurs and Helpers Local Union 639, D.C., 33 F. Supp. 645, in a none too clear statement, the court holds that to charge one with being unfair to labor is libelous per se. We are not inclined to follow this expression of the District Court of the District of Columbia.

To sum up, we hold first that the words objected to were not reasonably capable of the construction that the plaintiff had violated the National Labor Relations Act or that the plaintiff was unfair to labor, but, even if the words were capable of being construed as charging that the plaintiff was unfair to labor, we do not think such a charge is libelous per se.

The judgment of the District Court is affirmed.

SPARKS, Circuit Judge, concurs in the result.